## LINCOLN v. STONE.

No. 12483.

Court of Civil Appeals of Texas. Fort Worth. June 20, 1931.

Rehearing Denied Sept. 19, 1931.

Bonner, Bonner & Childress, of Wichita Falls, C. P. Engelking, of Electra, and R. G. Storey, of Dallas, for appellant.

Ben W. Tipton, of Electra, and Weeks, Morrow, Francis & Hankerson, of Wichita Falls, for appellee.

CONNER, C. J.

This is an appeal from a judgment in favor of appellee Violet Stone in the sum of $20,000. The trial was had upon the plaintiff's first amended original petition in which she alleged, in substance, that in April, 1924, she had married John Minnick and lived with him until the early part of 1925, when they separated and had not lived together since; that she never intended to again live with him, and that throughout the period of their separation John Minnick had entirely abandoned the plaintiff and that for more than five years she had not heard from him; that he has not contributed anything to her support, and that they have not treated or regarded each other as husband and wife since said time of their separation; that they have no property of any kind, and that the plaintiff since said separation has managed and conducted her own affairs, and has worked and earned her own living; that she had no knowledge of where John Minnick was at the time of the institution of the suit, and for some years prior thereto, and could not therefore join him in this suit, or apply to him to prosecute the same.

Plaintiff further alleged that the defendant, W. P. Lincoln, doing business as the Lincoln Tank Company, was a resident of Wichita county, Tex.; that he was engaged in the business of building oil field tanks and delivering same throughout the oil fields in Electra, Burkburnett, Vernon, and many other fields where crude oil is produced, and maintains and operates a factory in Electra, Wichita county; that in the course of his business, the defendant operates, through his agents, servants, and employees, a number of trucks for the purpose of delivering said tanks and hauling other supplies and materials to and from said factory; that on or about the 21st day of October, 1928, defendant was engaged in said business and at said time had two automobile trucks in operation upon the highway between Harrold and Electra; that said trucks were proceeding in the direction of Electra on said date about 7 o'clock p. m.: that one of said trucks, driven by one Tom W. Kerns, a servant and employee of defendant, had a bed composed of a wooden framework and there were some loose pieces of timbers on said bed which projected on the side and to the rear of the frame of said truck some 10 feet beyond the bed or framework; that at said time there were no lights on said truck, front or rear, and said truck was following the lights of the other truck belonging to the defendant in front of it; that there was no flag attached to the rear of said timbers or on the rear of said truck, and no other signal or means used for warning others who might be on the highway at said time of the condition of said truck and the timbers on said bed; that said truck was not equipped with a cab, such as trucks usually have, but the driver of the truck was seated on the edge or end of the timbers in front on an improvised seat in order to leave the entire bed and framework of the car as much unoccupied as possible so that the large tanks could be more easily placed thereon and transported; that such character of truck without a cab is very unusual and not often seen on the highway; that the trucks as so constructed and operated without lights and without the signal flag on the rear of said timbers constituted a dangerous instrumentality and an obstruction and danger to others using the same highway.

It was further alleged that at the time and hour of night stated, it was difficult for people using the highway and driving motor vehicles to observe unlighted objects on the highway; that at that time plaintiff was in company with one Gaston Scott, who was an experienced driver; that said Scott was driving a Dodge coupé and going in the same direction as said truck, and had overtaken the truck a short distance from Harrold in the direction of Electra, plaintiff at the time being his guest in the automobile; that at said time Scott was driving said automobile in a careful and prudent manner and at a safe rate of speed and well within the rate of

speed permitted by law. That neither the plaintiff nor Scott saw the truck in front of them for the reason that same carried no light, and for the further reason that it was impossible to see an unlighted truck without a cab on this occasion due to the fact that just at the time the said Dodge car approached the truck and got within some 25 to 50 feet of same there were several cars approaching in the opposite direction with bright lights which dimmed and obstructed the vision of the plaintiff and Scott, and the noise from the motor on his car was such that neither of them could hear or notice the noise from the truck; that at the time said truck was not making any discernible amount of noise for the reason that it had come to a stop, or practically so, and plaintiff alleged that the motor was not running and said truck was at a full stop on the highway; that same had not pulled off the pavement or, if mistaken in that statement that the truck had come to a full stop, then plaintiff alleged that it was proceeding very slowly and she and Scott thereby came on it so suddenly and without being able to see the same as that the said Dodge coupé struck the truck violently and at a rate of speed of some 15 to 20 miles an hour, and by the force of the impact and violent crash of the two vehicles the said plaintiff suffered severe and permanent injuries and Scott was killed.

It was further alleged that neither plaintiff nor Scott knew of the presence of said truck and their proximity to it, and had no way of knowing, under the circumstances, until the timbers projecting to the rear of the truck pierced the windshield of the car in which she was riding about the height of her head as she sat; that said timbers struck her in the face, knocked out a number of teeth, and crushed her head and other portions of her body, and rendered her unconscious and unable to gain possession of the steering wheel and control of said car.

Plaintiff further alleged:

That she suffered "a compound fracture of the mandible, and maxle compound dislocation of left side of mandible, multiple lacerations of face, fracture of the right clavicle, laceration of both legs and bruises and lacerations over the entire body and several splintered teeth. That in receiving said injuries foreign substances were swept into the wounded parts to such an extent that blood poisoning set up, which was in this instance an unavoidable complication.

"That ever since the date of said injury the plaintiff has been confined in the hospital under the constant care of doctors and nurses and constantly subjected to the use of opiates and other drugs and has been forced to undergo several surgical operations.

"That as a result of said injuries she has suffered constantly great pain, both mental and physical, and she is now suffering such pain, and will continue to suffer pain, both mental and physical, through the balance of her life."

Plaintiff further alleged that she was 26 years of age; that the injuries specified were permanent; that she will be a cripple throughout her entire life; that she is permanently disfigured and her face scarred and marred, which condition is permanent, and all of which causes the plaintiff great mental pain and humiliation, as well as physical pain; that she is now and will always be unable to speak except with the greatest difficulty and in a broken manner, and she will be unable to chew her food and use her jaw in the performance of the ordinary functions as she did before such injuries; that her nervous system had been greatly shocked from which she will never recover; that she will be unable to perform the ordinary duties and functions of life, etc. She further alleged that before she received said injuries she was an able-bodied person, in full health and vigor, engaged in the ordinary pursuits of life and capable of indulging in all of the ordinary pleasures of life; that she was a trained nurse, having followed that profession for a number of years, and was earning the sum of $6 a day in her profession; and that she would have continued to earn said sum and her earning capacity would have increased as she became more experienced, but for the fact that she was now injured as aforesaid. That because of all of these facts she had been damaged in the sum of $35,000. She further alleged that the injuries she sustained and the damages resulting therefrom had been directly and proximately caused by the negligence of the defendant in the following respects: (a) In operating the truck at the time and under the circumstances with said timbers projecting therefrom and without having a tail-light or signal on the rear of the truck to give warning to those approaching from either direction; (b) in that the driver did not leave 15 feet of the roadway to the left of the truck clear, in violation of section 10 of article 827a, Vernon's Tex. Crim. Statutes; (c) that the operation of the truck in the manner stated was in violation of the laws of the state of Texas requiring such vehicles to carry tail-lights and to be lighted at night; (d) that it was negligent to operate said truck at the time, which was night, without a red flag in the rear of the timbers, as required by article 827a, § 4, Vernon's Tex. Ann. Crim. Statutes. It was alleged that each and all of the criminal acts were the proximate cause of plaintiff's injuries and damages.

The defendant answered by plea in abatement and by a general demurrer to plaintiff's petition questioning the legal capacity of plaintiff to maintain a suit in that she was the wife of John Minnick, who, it was alleged, was the only person under the laws of this

state authorized to file and maintain an action for personal injuries such as alleged in plaintiff's petition, and that plaintiff was neither a proper nor necessary party to the suit. Subject to the pleas in abatement, defendant also presented numerous exceptions to the plaintiff's petition, some of which it will be necessary to notice in the further course of this opinion.

Defendant also pleaded a general denial, and specially that plaintiff was guilty of contributory negligence directly causing and contributing to cause her injury, if any, in that she took passage in the car with a driver who was reckless, careless, and negligent, to wit, one Gaston Scott; that it was then and there her duty to keep a sharp lookout and know what was in the road ahead of the car in which she was riding; that she knew at what rate of speed said car was being driven and knew and understood that said car was running at a rapid rate of speed at said time of the accident, and she knew that the car was not under control of the driver so that it could be immediately stopped in the event of an obstruction coming upon or being found on the highway; that plaintiff could either have gotten out of said car or could have persuaded the driver to run at a slower rate of speed and exercise proper care and caution in driving the car along the road at the place where the accident occurred; that the duty rested upon the plaintiff and the driver of said car to be sure that the car was operated at a speed sufficiently slow to be able to stop immediately at any time any obstruction came into view within the range of the lights which they had on their car; that notwithstanding this duty and the fact that plaintiff knew that such duty rested on her, she continued to ride in said car with Gaston Scott and without warning said Scott and permitting him to drive his car into and upon the truck that was on the highway; that said negligence of plaintiff directly and proximately caused and contributed to her injuries; that she was guilty of contributory negligence causing her injuries, in that she well knew Gaston Scott to be a fast and reckless driver and one who frequently drove at an unlawful rate of speed, and that she nevertheless deliberately and purposely went driving with him many times prior to the day in question, and on said day left Electra with him purely for a social or pleasure ride, and had gone north in the direction of Vernon and spent considerable time and was returning toward Electra in a great hurry to reach Electra by 7 o'clock, at which time her duties as a nurse required her to be at the hospital where she worked, the accident in question occurring about 10 minutes before 7 at some 6 or 7 miles from Electra, and at a time when, as she well knew, the car in which she was riding was being driven at an unlawful rate of speed; that plaintiff was further guilty of contributory negligence in that she well knew that Scott was a man who frequently drank intoxicating liquors and often drank to excess, and had drunk considerable liquor on the day in question, yet she entered the car with him for the purpose of taking a pleasure or social drive, and was with him for several hours, and had many opportunities to alight from the car and leave the same if she desired to do so; and well knowing that he was under the influence of liquor on this day, she continued to ride with him without protest and without trying to induce him to drive slow, she submitted herself to his driving and permitted him to drive in such a way as he saw fit and at a very rapid and unlawful rate of speed which he attained at the time of the accident; and further that she was guilty of contributory negligence in that just immediately before the accident in question the car in which she was riding had passed two or three other cars at a rapid and unlawful rate of speed and without slowing down to the speed required by law in passing such cars; that she was further guilty of contributory negligence in that at the time of the accident the car in which she was riding was meeting another car traveling in a northerly direction, and that it was within less than 50 yards of the car she was in and within less than 50 yards of the truck which they were attempting to pass, all without slowing down to the speed required by law or making any effort to do so, or without her having suggested to Gaston Scott that he proceed at a slower rate of speed. That she was further guilty of contributory negligence in that she was riding in the car with Gaston Scott at a fast, reckless, and dangerous rate of speed and did not keep a proper lookout for traffic ahead; and that she wholly failed to take the reasonable precautions for her own safety, but depended on Scott to do so.

Upon the conclusion of the evidence and argument of counsel, the case was submitted to a jury upon special issues, together with definitions of negligence, proximate cause, new and independent causes, unavoidable accident, and contributory negligence. In reply to the special issues submitted, the jury answered, so far as necessary to state, that the collision in question was not the result of an unavoidable accident; that the defendant's truck which was hit by the Dodge car was being operated at the time it was struck without a tail-light; that the collision occurred after dark; that the conduct of defendant's employee in driving and operating the truck at the time constituted negligence; that such negligence of the employee was the proximate cause of the injuries to Violet Stone; that a preponderance of the evidence failed to show that Gaston Scott was a reckless, careless, or negligent driver; that the evidence failed to show that anything occurred on the trip to Vernon and return with reference as to whether Scott was under the influence of intoxi-

cating liquor, or with reference to the manner in which he operated said car as to constitute any warning to said Violet Stone that Scott would likely drive said car at a dangerous rate of speed or in a reckless or careless manner; that a preponderance of the evidence failed to show that at the time of the collision in question Gaston Scott was driving said car at a dangerous or reckless rate of speed; that such preponderance of the evidence failed to show that at the time of said collision Gaston Scott was driving said car in a dangerous or reckless manner.

In answer to special requested issues the jury further answered that the driver of the Dodge car immediately prior to the collision with the Ford truck had it under control. The jury also found in answer to a special issue relating to the subject that plaintiff had been damaged and assessed said damages in the sum of $20,000.

Upon the incoming of the verdict, the court entered its judgment in favor of plaintiff, Violet Stone, against the defendant, W. P. Lincoln, doing business as the Lincoln Tank Company, in the sum of $20,000, together with all costs of suit, etc. From this judgment the defendant has duly prosecuted an appeal to this court.

In our disposition of the appeal, we shall endeavor to dispose of the questions presented in appellant's 81 propositions of error in the order of their importance, rather than in the order in which they are presented. At the threshold of our consideration of the case, we are met with appellant's proposition insisting that the court erred in overruling its plea in abatement and a general demurrer, the contention being that inasmuch as the plaintiff, Violet Stone, was shown to have been a married woman and the damages for which she seeks to recover is community property under the terms of our Constitution, she was an improper party plaintiff and without the legal capacity to maintain the suit. That the damages involved constitute community property must be conceded, and it has been repeatedly decided that as a general rule the husband has the exclusive right to manage and control it, and that he alone is the proper party to sue for its recovery. See Smith v. Butler, 72 Ark. 350, 80 S. W. 580; Northern Tex. Traction Co. v. Hill (Tex. Civ. App.) 297 S. W. 778; Teague v. Fairchild (Tex. Com. App.) 15 S.W.(2d) 585.

In the case of Texas C. Ry. Co. v. Burnett et ux., 61 Tex. 638, Burnett and wife both sued to recover damages for personal injuries alleged to have been received by the wife of Burnett in a collision between two of appellant's trains. The petition was objected to on the ground that the wife was an improper party, and the judgment was reversed on this ground.

In Middlebrook Bros. v. Zapp, 73 Tex. 29, 10 S. W. 732, the wife and others sued to recover a debt alleged to be the separate property of the wife, the husband joining pro forma, and it was said that if the allegations had shown the true facts (that the debt was a community debt), the wife would have been an "unnecessary party," and exceptions to the petition on that ground if made ought to have been sustained. This case is cited with approval in Western Union Tel. Co. v. Campbell, 36 Tex. Civ. App. 276, 81 S. W. 580.

In Northern Texas Traction Co. v. Hill, 297 S. W. 778, the El Paso Court of Civil Appeals held that the husband was a necessary party to the wife's suit for community property.

In Wartelsky v. McGee, 10 Tex. Civ. App. 220, 30 S. W. 69, the wife sued to recover liquidated damages on a liquor dealer's bond, joined pro forma by her husband. The wife recovered, but the judgment was reversed on the ground that her husband had the right to sue, and this court in the case of Yellow Cab & Baggage Co. v. Smith (Tex. Civ. App.) 30 S.W.(2d) 697, was in accord with the decisions above noted, and further held that the fact that the wife was joined pro forma by her husband did not relieve the objection to the wife's suit.

But in none of the cases mentioned does it appear that the husband had abandoned the wife.

In Ezell v. Dodson, 60 Tex. 331, our Supreme Court held that, quoting from the headnotes: "A mere separation of the husband and wife, and his refusal to join her in the action, is not sufficient to authorize the wife to prosecute alone a suit to recover damages for an assault and battery committed upon her during coverture."

But in this case, as already noted, the plaintiff pleaded, and her testimony on the trial fully supports the pleading, that she and her husband had not only been separated for some five years, but that he had abandoned her, refusing to support her or communicate with her, and that she did not know where he was. No evidence was offered to the contrary, or tending to show his residence or indeed whether he still lives.

In Cullers & Henry v. James, 66 Tex. 494, 1 S. W. 314, it was said by our Supreme Court that:

"At common law, the civil, as well as the natural, death of the husband restored to the wife her rights and powers as a feme sole, if she was thus deprived of the benefits of marriage. Wheat, Selw. tit. 'Baron & Fem.'

"In Texas, practically, the protection and disability of marriage have been linked together, and the wife, when deprived of one, has been released from the other. Ezell v. Dodson, 60 Tex. 331, and cases cited.

"Humanity requires that when thrown upon her own resources by the abandonment of her husband, or by his lunacy or imbecility, she shall be unfettered in her struggle for exist-

ence and independence. * * * She has equally with her husband an interest in the community property, and while her husband is the managing partner, and may assert his prerogative as long as he exercises it in good faith, yet, certainly, when he abandons the wife and their property, there can be no principle in our law or practice which would prevent the wife, as a party in interest, from asserting her rights in the courts. The husband has abdicated his authority, and by that act enabled the wife to appear in court in her own name and right.

"The property out of which this litigation arose was not only community property, but was claimed to be exempt from forced sale. Mrs. James, therefore, had in it a special interest, which the husband could no more sacrifice by abandonment than he could otherwise dispose of without her consent."

In Houston & T. C. Ry. Co. v. Lackey, 12 Tex. Civ. App. 229, 33 S. W. 768, it was said, quoting from the headnotes, that: 'In an action by a married woman against a railway company for placing cars in front of plaintiff's premises, plaintiff's testimony that her husband had abandoned her for more than four years is admissible to show the wife's right to sue alone."

In the case of St. Louis S. W. Ry. Co. v. Griffith, 12 Tex. Civ. App. 631, 35 S. W. 741, writ of error denied, it was held that, quoting from the headnotes: "A wife who has, without her fault, been permanently abandoned by her husband, and left without means, may maintain an action for a tort without his joinder."

The case of Texas & P. Ry. Co. v. Fuller, 13 Tex. Civ. App. 151, 36 S. W. 319, writ of error denied, was an action for personal injuries to a married woman who had been deserted by her husband, and it was held that she was entitled to recover.

Missouri, K. & T. Ry. Co. v. Hennesey, 20 Tex. Civ. App. 316, 49 S. W. 917, 918, was a case in which a wife sued for damages on the ground of negligence in carrying her by her station. The petition alleged that the plaintiff was the wife of one James Hennesey, "who, more than two years ago, voluntarily abandoned her, with the avowed intention of permanent abandonment"; that her husband was not a resident of Texas, and had been absent from the state for a time prior to the filing of the suit, and that his whereabouts were unknown to appellee, and had been since his abandonment of her, although she had heard that he was in the state of Illinois. Demurrers were presented to the petition on the ground that appellee had not alleged an effort to locate her husband, or that he had refused to join her in the suit, or that she was without means of support, and that it was necessary to bring the action to collect the money as a means of support. The court held that the trial court did not err in overruling the exceptions, citing a number of cases, and

further stated that the court had seen no authority for the proposition that, "when the wife has been permanently abandoned by her husband, as a condition precedent to her right to sue she must allege and prove that she made diligent effort to locate him. If he has abandoned her permanently, without fault on her part, and she was left to support the family by her efforts, she had the right to sue, whether she knew where her husband lived or not."

No effort on the part of appellant appears to have been made by cross-examination or otherwise to show that the plaintiff had been in any wise at fault in the abandonment or separation from her husband, and the trial court incorporated in his judgment the following order: "It is therefore ordered, adjudged and decreed by the court that the plaintiff, Violet Stone, who is also known as Violet Stone Minnick, is entitled to prosecute this suit and recover such damages in her own right."

We conclude that no error in the action of the court was committed in overruling appellant's plea in abatement and general demurrer.

By request for a peremptory instruction and otherwise, it is insisted that the evidence is wholly insufficient to sustain the verdict and judgment in appellee's favor on the issue of the truck driver's negligence in driving the truck without a tail-light. As already pointed out, the jury found that he was negligent in this particular and that such negligence was the proximate cause of plaintiff's injuries. Plaintiff testified, among other things, that: "This collision occurred after dark; I saw an object just an instant before striking. I did not know what we were riding into. I did not know whether it was a wagon or a truck. I knew it was a dark object. It did not have any lights on it that I could see. I was looking straight ahead at that time. I could have seen a light if there had been a light. I saw that object an instant before I struck it."

H. O. Houtchins, a traffic officer, testified in behalf of plaintiff as follows: "I recollect an occasion about October 21, 1929, of an automobile collision in which a man named Scott was killed. * * * I went to the scene of the accident. I saw two Ford trucks and this Dodge coupe there on the road side. * * * Both trucks were board trucks, plain trucks without any cabs with a bed—just flat trucks with a bed—did not have a cab on either one of them, just plain flat trucks. * * * When I went out there the back truck was headed down into the bar pit, and the other truck * * * but a short distance down the road pulled off of the side, running straight with the road. * * * I examined all of the motor vehicles as close as I could. The first thing I noticed about the rear truck was about the light, there was no rear light on it, and there was a shell, what I mean,

there was nothing there to make a light, in the socket, no bulb you know, and one of the head lights was wired up, the left hand light was wired up. The tail light was not wired up. There was not any evidence of the base of the bulb in the socket as if the glass had been broken and left in the base of the socket. If there had been a light or bulb in there which was knocked out during the accident there wasn't any pieces of glass or anything like that left in there after the accident. When I said that about the tail light being wired up I meant there wasn't any socket there, if there had been a socket and the wire going in there it would have been still there but there was no socket or wire running to it. I examined it. I saw it myself. I made a notation of it at the time."

A Mr. Leon Jones testified in behalf of plaintiff: "I live at Electra. I am a little better than 22 years old, I am betwixt 22 and 23. I know Mr. Lincoln. I am a mechanic at Electra, garage mechanic. * * * I have had about 12 or 14 years work on automobiles. * * * On the night of this accident on the Harrold road, in which Mr. Gaston Scott was killed and this lady here was hurt, and in which a Dodge coupe ran into a Ford truck, I went out that night from town and brought the Dodge coupe in. * * * That was between eight and eight thirty, on the same night. At the time I went out there, at the time in question, I examined the tail light on the Ford truck. You have here the shell of a Ford truck tail light, together with the back end of the frame work, the corner of the bed, which was brought here by Mr. Lincoln, looking at that I don't see the stem of any light bulb in that socket. There was not a stem of the light in that socket on the night that I went out there to the scene of the accident. That part of the wire which you have in your hand and which is the plug that goes to the lower part of the socket, that was hanging out of the tail light. I had my flashlight with me, I saw the shell of the tail light on the inside of it. I did not see a piece of the light globe or bulb inside the shell at that time."

A photograph was also introduced in behalf of plaintiff, indicating, as was insisted, that the bulb had not been smashed and that if there had been a bulb its base would have been in the socket of the lamp. It is true that the driver of the truck testified to the effect that the tail-light was burning; that a short time previous thereto he had had trouble with the front lights and he had wired them up, and at that time the tail-light was burning.

Another employee of appellant testified that he had repaired this light shortly before the accident and that he had put a bulb in the lamp, which was a magneto light; and that after the accident he examined the light and saw the stem and bulb still there.

The rule is well settled that in determining the sufficiency of the evidence to support a finding of the jury, the evidence favorable thereto is to be considered to the exclusion of the evidence of a contrary tendency, and, so considered, we conclude that the court did not err in refusing the peremptory instruction or set aside the verdict of the jury on this issue on the ground of the insufficiency of the evidence to sustain the finding that there was no tail-light on the truck and that the driver thereof was guilty of negligence in operating it at the time. Nor do we think the peremptory instruction would have been proper on the ground that the plaintiff herself was guilty of contributory negligence, or that the driver of the Dodge car was guilty of such negligence and that the same was attributable to plaintiff. While there was some testimony tending to show that shortly previous to the collision and while passing some other cars, the Dodge coupé was driven at a very rapid rate of speed, yet at and just prior to the collision plaintiff testified to the effect that they were driving moderately and in no event to exceed 35 miles an hour; that Scott was a careful driver; that she had often driven with him and never regarded him as a reckless driver; that Scott was not drunk, nor had be been drinking to her knowledge during the trip. There is nothing in the evidence which, as we think, constitutes the plaintiff guilty of contributory negligence as a matter of law in accepting the invitation of Scott to accompany him on his journey or in failing to warn him against rapid driving, or in any other particular alleged.

It is true the evidence shows that the Dodge car was equipped with lights that were burning at the time and one of appellant's contentions is that Scott should have had the car under such control as to have enabled him to have stopped it in time to have avoided the collision, and that plaintiff herself was guilty of negligence in failing to see the car and in failing to warn Scott or otherwise exercise due care for her own safety. But we agree with what was said by the court in Morehouse v. Everett, 141 Wash. 399, 252 P. 157, 160, 58 A. L. R. 1482, where it is said:

"We believe that, generally speaking, where the statutes or the decisions of the courts require red lights as a warning of danger on any object in the highway and such lights are not present, it is a question for the jury to determine whether the driver at night should have seen the obstruction, notwithstanding the absence of red lights. In this day when the roads are crowded with automobiles, a red light is at once recognized as a signal for danger and therefore for cautious driving, but the absence of a red light, where the statutes or the decisions of the court require them, amounts to an im-

plied invitation to travel the road in the usual manner. In many portions of this state, fogs are frequent—fogs so thick that the driver of an automobile cannot, by means of his headlights, clearly distinguish an object 5 feet in front of him. Must he stop on the road? If so, all others must do the same, and thus all traffic must cease. And in the process of stopping and blocking the road, many collisions must occur. A rule that will force this condition is a dangerous one and must do infinitely more harm than good.

"To hold that one is, as a matter of law, guilty of contributory negligence in not, under all circumstances, seeing whatever his lights may disclose, would be to practically nullify the statutes which require red lights to be carried upon automobiles and to be placed upon obstructions in the streets or roads; or, at least, to encourage travelers on the roads, or those placing obstructions therein, not to comply with the law in those respects, for, under the rule contended for, a disobedience of the law with regard to red lights would not entail any evil consequences."

The cases of Sawdey v. R. W. Rasmussen Co., 107 Cal. App. 467, 290 P. 684, and Tresise v. Ashdown, 118 Ohio St. 307, 160 N. E. 898, 58 A. L. R. 1476, by the Supreme Court of Ohio, express similar views, and the Texas courts have always held that the issue of contributory negligence is ordinarily one for the jury's determination. It was so held in the recent cases of D. & H. Truck Line v. Hopson, 4 S.W.(2d) 1013, by the El Paso Court of Civil Appeals, and D. & H. Truck Line v. Lavallee (Tex. Civ. App.) 7 S.W.(2d) 661. In the case of Hewitt v. Green (Tex. Civ. App.) 28 S.W.(2d) 892, 893, there was a rear-end collision with an unlighted automobile. It was there said by the Waco Court of Civil Appeals: "We think the questions of negligence, contributory negligence, and proximate cause were all raised by the evidence, and proper for the decision of the jury, and it is thought there is sufficient evidence to support the judgment of the trial court."

See, also, Texas Interurban Ry. v. Hughes (Tex. Civ. App.) 34 S.W.(2d) 1103, 1106; Kirksey v. Southern Traction Co., 110 Tex. 190, 217 S. W. 139.

As appellee well says, it is the common experience with people who drive automobiles that the absence of a red lamp on a car is the most dangerous thing on the road. It would seem reasonable to assume that the driver of an automobile at night has reasonable assurance, at least, that there will be no cars without red lights, and that his speed and attention must be considered in the light of such assumption, and that when an unlighted car suddenly thrusts itself before him, it will be the function of the jury to consider all of the circumstances in determining whether or not he was negligent.

■ Nor do we think it can be said that under the circumstances the negligence of the driver of the Dodge car, if any, must be imputed to the plaintiff. She testified to an acquaintance with Scott, and to have accompanied him on drives a number of times, and that on the occasion in question she merely accepted his invitation to ride with him to Vernon on a mission of his own; that she was in no wise engaged in a common enterprise with him, nor assumed control of the car. In other words, the effect of her testimony was that she was a mere guest of Scott's.

In the case of West v. Bruns, 294 S. W. 235, it was held by the Texarkana Court of Civil Appeals that the negligence of an automobile driver who invited the plaintiff to ride with him was not imputable to the plaintiff so as to bar her recovery from a third person who was negligent, for injuries in a collision, as a matter of law, where the plaintiff did not exercise any control over the car in which she rode. It was further held in that case that where concurrent negligence of two automobile drivers, with one of whom plaintiff was riding as a guest, resulted in injury to her, she may recover from either or both. Of like force and effect are the cases of Yturria v. Everton, 4 S.W.(2d) 211, by the San Antonio Court of Civil Appeals; 46 Corpus Juris, p. 1031, § 588; 5 Texas Jurisprudence, p. 789, § 171. In the latter authority (section 171,) it is said: "In an action against the other party to the collision, a case for recovery is presented where the evidence shows that responsibility for the occurrence is attributable to the defendant or to his driver, and not to the driver of the vehicle in which the plaintiff was riding. Furthermore, the plaintiff makes a case for recovery by proof (1) that the defendant operated his vehicle in a manner forbidden by law, and (2) that the plaintiff himself had nothing to do with the mode of operation of the vehicle in which he was riding. Nor need he show that he took active measures to discover the danger or prevent the collision. In affirming a judgment in favor of the plaintiff, the court said: 'It was not incumbent on the guest to suggest the way in which the automobile should be operated. A recovery is not precluded by the circumstance that the plaintiff failed to maintain a lookout and warn the driver of the vehicle in which he was riding.' "

Under appellant's fifty-ninth proposition there is a complaint of misconduct on the part of the jury that in the absence of an explanation would seem to be well founded. The complaint was urged in defendant's motion for new trial, and the testimony introduced relating to the subject, comprising some 35 pages of the statement of facts, has been carefully read and considered. The juror J. E. Walker testified that after the

jury had retired to the jury room for their deliberations, they called for a piece of timber which defendant had taken from the truck and to which was attached the tail lamp, and which had been introduced in evidence on the trial and which plaintiff alleged was unlighted. It was brought in the jury room a few minutes after their retirement where it was examined. The juror J. E. Walker, among other things, testified: "I am in the garage business, and I am a mechanic. When we got this in there (the piece of timber) all of the jury looked at it, we all looked at it—discussed it while we were looking at it. As to whether or not up to that time we had answered any issues written out any answers to any issues up to the time we did bring this piece of timber into the jury room, I will state up to that time—I think we had—yes. No, I am not positive whether we had answered any issues or not, but I think we had. Being a mechanic I know about the wiring of tail lights and head lights. I know what it takes to make a light burn, in the way of electric current and sockets—currents and everything like that. And I know about Ford lights. I have had lots of experience with Ford lights, quite a bit. Yes, I know that the Ford truck had no battery, but was running on magneto. From my experience as a mechanic and the way this is wired up I will say that it could not be made to burn. I explained that to the jury. * * * Yes, sir, they all accepted the proposition that it not only was not burning but could not be made to burn; there were several of them did not think it would burn before I said anything about it. In other words, there were some of them that understood it just like I did. Yes, I guess it is right that there were some that did not know one way or the other about the mechanism of the light. * * * They had some question on it. * * * Yes, I explained to them why it would not burn, in the first place, it had the wrong socket and in the next place it was not grounded properly. * * * I will say that it has not got the right plug in it. * * * Of course I can not tell you if that is the same plug that was in there, it should be a center contact—I suppose that is the same plug, it looks like it did when I saw it there in the jury room."

We will not quote the precise language of this witness further, but state that his further examination in substance was to the effect that the piece of timber with a lamp attached had been passed around among the jurors during the argument of counsel but that he never did think the lamp was burning; that he did not remember any special argument in the jury room between the jurors relating to the matter; that they agreed that some of the witnesses were not telling the truth about it; that one of the jurors examined the timber and light in the jury room and observed that the wire socket that fastened in the light socket was "a double contact whereas the light socket is (was) a single contact. That is an easy matter for anybody to see that observes it closely. The light socket is metal. It fits in the light itself, or that is we would say the shell, the light—here where it joins on the light." He further testified: "There is no difficulty in seeing what constitutes all of that. There is no difficulty at all in seeing the way that the double contact in the wire socket would not fit upon the single contact in the light socket. * * * There was not any juror that failed to see the single and double contact when I pointed it out to them. There was not anything to be done to show it to them except to hold it up and let them look at it, and some of the jurors who had experience in old Fords seemed to be as familiar as I was. * * * The jury also secured pictures of the wrecked automobile that had been introduced in evidence and had those brought into the jury room at the same time."

Juror Dunn testified, among other things, that he saw, as an exhibit, offered during the trial of the case a piece of timber with a tail-light on it, and that it was discussed in the jury room. He further said: "I myself am a mechanic and I understand about electric wiring, at least to some extent. I have known Mr. Walker for a long time. * * * He was on the jury and I saw him in the jury room and heard him examined as a juror, and I know that he runs the Walker garage. * * * After looking at the exhibit here and examining the wire and socket, and the light socket, I saw that the wire socket had two circuits, two brass plugs there sticking through the end of it, and that the light socket had one brass post. * * * I guess that three or four of them knew about those wires anyway. As to whether or not the 12 men on the jury, I would not say that three or four of them seem to know as much about it as I did, I will state that they just said that they could not see how the tail light would burn. * * * After examining it carefully and observing the single contact and double circuit, as I recall there seemed to be three or four did not know much about it. You see we all agreed that it would not burn. All of the jury, so far as I could tell, agreed that the light not only was not burning at the time of the accident but it never had burned and could not be made to burn. As to whether, right at that time, just before the argument was closed, at least during the last argument I caught that—yes, in a very short time, I could see that it wasn't the right kind of connection. Some one else said that they seen the same thing—some one there in the jury room said that. * * * I did not think it would be anything wrong to explain to this juror something that was very plain on the face of the exhibit—that was with

reference to the fact that the point which is the single contact does not fit over where one of the two points is double contact but fits in between them. That is the whole thing."

Juror Martin testified: "I am not a professional mechanic but I have owned seven or eight automobiles. Here in the court room I seen about that single contact and double contact. * * * As to whether I found out in the jury room, that the wire socket was double and the light socket was single—yes sir, I did by inspection. * * * There were several mechanics on the jury,—they told what they thought about it, and my own experience helped me, because I had some experience in that line. * * * As to whether there was any one that seemed to know more about it—well I did not listen to Mr. Walker, the mechanic, in particular, I could see for myself, and I did not pay but mighty little attention to the question of whether it was burning or not, for I knew it was not from what I heard in the court room. * * * Absolutely, I decided before I went into the jury room that there wasn't any tail light burning—I decided that from what I saw and heard in the jury room—from the evidence. And going out in the jury room and looking at this exhibit did not change my mind one bit. I was impressed with the fact that there wasn't any light to burn because the material part of the lamp was not in the socket, that metal part of the bulb was not in the socket—you know I heard that and determined that from the evidence."

Juror Moore testified that: "I don't remember about Mr. Walker saying anything about the single contact and the double contact. As to whether after all of the discussion and explanations, and after looking at it myself, and seeing it I concluded that it was a fact that it could not be made to burn in that condition—well I did not think it could. * * * I don't know whether it was in 1924 or 1926 that they quit using that kind of light on Fords. I do know enough about cars and lights on cars with reference to single and double contacts—and about what it takes. I am in the cattle and farming business. I have never been a mechanic at any time. * * * I had rather definite conclusions that the tail light was not burning before I went in the jury room. I don't know how many others were in the same shape."

It was then agreed by counsel for both sides that the remaining members of the jury would have testified to practically the same set of facts as has been testified to by the jurors who had been examined, and agreed that the court may consider that such testimony was introduced.

Thereafter the defendant called A. B. Landers, who testified that he was an automobile mechanic and had been for about 20 years and was familiar with Ford cars and Ford taillights, and referring to the exhibit said: "This is a piece of timber, on the side of it is a tail light—some wires, plugs, etc., attached to it—that is known as a Ford tail light. I have seen this before. This is what we usually call a double contact plug—there are two kinds, single and double. This wire plug is a double circuit, and the light plug has a single circuit, as to whether that can be made to burn that way—well I will answer that—they work, and they don't work, if they work they are all right, and will, and if they won't they will not. I can make this one work but I can not make it work for over three or four minutes, at a time. * * * With reference to those two posts, you have in order to make it burn have a direct current—a good tight joint—and the socket has to be level, has to touch. There are different ways to make them touch, I can turn that half on, and it will not burn like it does now. It is a little loose now. If you would put a package of tin foil in there, it would burn, it would be connected—as long as the two touch it will burn all right. That will work on a magneto the same as it does with a battery. * * * If, before the accident and wreck, this socket was level, and firm and connected to the shell, it would light right straight through, if you have this turned right, not too far, if the point gets in between the two it will not burn. If turned like it is now it will burn, and burn steadily. as long as it is level. Of course when it is loose like it is now, and gets a pretty severe jolt it may go off and come back on. * * * Yes, the best way to make that light burn on the back end of a truck would be to run along behind it and hold it just right. That would be the proper way."

In support of appellant's proposition, article 2234, Rev. Statutes 1925; St. Louis S. W. Ry. Co. v. Lewis, 5 S.W.(2d) 765, by the Commission of Appeals. Houston & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606, and some nine other cases, are cited, all of which have been carefully considered by us. The article of the statute cited makes misconduct of the jury a ground of reversal, and provides that: "The court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved. or the testimony received, or the communication made, be material."

The cases cited in behalf of appellant are all to the same general effect, to wit, that if from the testimony introduced bearing upon the subject it is reasonably probable that the jury were influenced thereby to the prejudice of the losing party, the case should be reversed. However, it was held by Section B of the Commission of Appeals, in the case of Bradley v. Texas & P. Ry. Co., 1 S.W.(2d) 861, 862, that, quoting from the headnotes:.

"On motion for new trial, the trial court has the same latitude in passing on the evidence offered as to the credibility of a witness and the weight to be given his testimony as a jury has on the original trial." And again: "On appeal from denial of motion for new trial, on the ground that there was misconduct of a juror, the appellate court must take the most favorable view of evidence produced, as the trial court was authorized to take."

In the case of Parks v. Missouri, K. & T. Ry. Co., 19 S.W.(2d) 373, 377, this court had occasion to consider article 2234, which is a re-enactment of a previous statute (Acts 1905, page 21), and we there said: "It is to be noted that the statute in order to constitute misconduct on the part of a juror requires that the testimony received, or communication made, must be 'material,' and it has been expressly so decided by our Commission of Appeals in the case of International-Great N. Ry. Co. v. Cooper (Tex. Com. App.) 1 S.W. (2d) 578, 580, in which opinion Judge Critz says: 'It will be seen that article 2234 expressly provides that a new trial may be granted, "if such misconduct proved, or the testimony received, or the communication made, be material." It is our opinion that the phrase "be material" applies to, and qualifies, the whole of article 2234.'"

In the case of Kaker v. Parrish, 187 S. W. 517, 518, by this court, writ refused, it was held, among other things, that a litigant, seeking to disturb a verdict against him, has the burden of showing, not only that the matters of which he complains, amount to misconduct on the part of the jury, but also that they operated to his prejudice. And, quoting from the headnotes : "Under such statute expressly committing the determination of questions as to the misconduct of jurors to the discretion of the trial court, its discretion is reviewable on appeal, but its action in overruling the motion for new trial on the ground of the jury's misconduct will not be disturbed where it seems that it acted fairly in its investigation."

■ It is to be noted that the vital issue involved in this case was whether the tail-light on the truck was burning at the time of the collision, and not whether at the time of its examination in the jury room it could not be made to burn. It is also to be noted that the fact that at the time of the examination in the jury room the tail-light was in such condition as to render it impossible of burning, did not necessarily preclude the truth of appellant's allegations that the light was in fact burning at the time of the collision, and not one of the jurors testified that his conclusion that the light was not burning at the time of the collision was brought about by the result of the examination in the jury room. On the contrary, one or more indicated that their minds were already made up on that subject from the evidence introduced in the

trial, and the examination of the lamp and attachments during the argument of counsel. It may be further noted that the testimony of one of the jurors indicated that there had been an examination of the members before the jury were impaneled, and there is no proof that appellant or his counsel were without knowledge that there was one or more auto mechanics on the jury. We think it may be assumed that appellant either knew, or by the exercise of ordinary care could have known, that fact, and yet with such knowledge defendant himself produced the timber, with the attached lamp, wires, stem, and socket, in evidence, and they were exhibited to and passed around among the jury before their retirement, and later without objection, in so far as the record shows, passed into the jury room, as under the statutes the court had the right to permit. It therefore must be said, we think, that appellant invited the examination and must be bound by the result. The introduction of these light appliances must have been offered by appellant to show that the tail-light was burning at the time of the collision, as his employee had testified. This being so, he cannot be permitted to blow hot and cold and now take advantage of an unfavorable result. This may be illustrated by the case of Taylor v. Commonwealth, 90 Va. 109, 17 S. E. 812, 815, where it is said: "The gun was introduced in evidence by the prisoner, and the four cartridge hulls fired from that gun during the trial by one of the prisoner's witnesses were put in evidence by the prisoner, to show the jury that they were struck by the plunger in his gun, differently from the two cartridge hulls which the prosecution had put in evidence as they had been picked up on the scene of the massacre. The gun was given to the jury in their room, without objection and by consent, and there is no exception on the ground that the gun was taken into the jury room. The court did not tell the jury how they should look at, examine, or consider the gun. The jury had the right to take the gun apart, and to examine the plunger, to see (as they did see plainly) that the gun and the plunger had been recently tampered with, and fixed so as to strike and explode the cartridges differently from those which had been used by the murderers, and put in evidence by the commonwealth. Davis v. State [91 Ga. 167], 17 S. E. 292. The prisoner's gun and the four cartridge hulls fired from it during the trial by one of the prisoner's witnesses, to show that the plunger in that gun struck the cartridges differently from the cartridges which had done the fiendish work of the cowardly assassins in their ambush, were put in evidence by the prisoner; but the dumb witness of the gun itself mutely convinced an intelligent and scrutinizing jury that the plunger in that gun had been recently tampered with and fixed for the occasion of the trial."

The following has been said in relation to invited error in Texas Jurisprudence, vol. 3, § 731: "A litigant on appeal or writ of error may not seek a reversal for error which he himself has committed or invited, even though the error is fundamental. One who by his own conduct has induced the trial court to commit error is estopped to assert that the action of the court is erroneous. For example, parties who have induced the trial court to act upon a certain assumption or theory will not thereafter be heard to say that the hypothesis is not correct."

We overrule all complaints of misconduct on the part of the jury.

There are a number of other assignments of error complaining of incidental matters which we think may be disposed of more briefly. We think the quotation last made from Texas Jurisprudence may be applied in answer to complaints or argument before the jury by appellee's counsel. These objections have all been examined, but, on the whole, nothing seems to require a reversal of the judgment. For the most part, the bills of exception indicate that the arguments were provoked by something said or done by opposing counsel or corrected by instructions on the part of the court. And nothing in the size of the verdict or other proceedings indicate that the minds of the jury were inflamed by the arguments to appellant's prejudice. Nor do we think the court's discretion was abused to appellant's prejudice in his rulings on appellant's special exceptions to the plaintiff's petition; or in his rulings on the introduction or rejection of the testimony.

■ We should perhaps specially notice the action of the court in refusing to take as confessed an ex parte deposition of plaintiff Violet Stone. It appears from the bill of exception that for the purpose of taking plaintiff's deposition appellant caused to be duly issued a commission therefor, requiring plaintiff's answers to 176 interrogatories. The return of the notary public, by whom the commission was received, shows that the plaintiff appeared before him and in fact answered the interrogatories, but after having done so and after having examined the same, she refused to sign the deposition, and on this ground appellant objected to plaintiff being permitted to testify upon the trial in contradiction of answers that could be taken as confessed, to wit, that plaintiff knew it was dangerous for her to ride with Gaston Scott at the time; that she voluntarily got into the car with Scott on the return journey from Vernon with full knowledge of the fact that he was very drunk and physically and mentally incapacitated for driving an automobile. That plaintiff herself had been drinking intoxicating liquors during that afternoon. That plaintiff did not caution Scott about driving too fast, and that she encouraged him to drive at a dangerous and reckless rate of speed in order that she might get back to the hospital in time to go on duty at 7 o'clock. The court declined to exclude plaintiff as a witness, and she was fully examined by her counsel, at times reading questions in the interrogatory. Appellant's counsel insisted that the whole deposition should be introduced, but this was declined, and error is urged to the action of the court and counsel. We overrule the assignment relating to the matter. By reference to article 3769, subd. 7, Rev. Civ. Statutes, it will be seen that it is the refusal of a party to answer that authorizes the penalty of a confession, as appellant is insisting upon. Many of the interrogatories seem to us to have been irrelevant and some of them perhaps impertinent, and we see nothing unreasonable in the plaintiff's refusal to sign the interrogatories, and particularly do we see no prejudicial error, for the reason, among other things, that the court afforded appellant full opportunity to offer the deposition in evidence in his own behalf. But this he declined to do.

Nor do we find reversible error in the court's charge or in his actions in giving or refusing special issues. The errors assigned, which only bear and have possible effect on the issues relating to the question of actionable negligence on the part of the driver of the car in which plaintiff was riding, are manifestly immaterial, in view of the conclusion we have already announced that the plaintiff was not guilty herself nor chargeable with the negligence of Scott. For this reason, therefore, the issues relating to Scott's alleged negligence will not be discussed or determined.

■ Finally we are met with the complaint that the verdict is excessive. We have carefully read the evidence relating to the subject and have concluded that the contention must be overruled. The evidence shows that the plaintiff was a young woman of some 26 years and good looking; that she was a trained nurse, receiving some $6 a day for services performed; that in the collision some six of her teeth were knocked out; that her face was badly disfigured, the lower maxilla being fractured on either side, and the anterior part of her chin being driven back beneath her tongue its position being later discovered by X-ray; that she had a fracture of the right clavicle and the outer fragment was displaced downward about an inch; that her lower lip was quite severely lacerated and the soft tissues beneath the tongue were severely lacerated, and some of the tissues lost; there were numerous brush burns and bruises about the face and shoulders; that the bone of the lower maxilla, which was at first thought to have been lost and later found by X-ray, was brought back into position as near as possible and wired on either side; that violent infection had taken place and opiates were continuously administered as the

pain was very severe; that a large abscess formed beneath the chin and extended into the neck, which had to be opened several times, and her mouth had to be continuously irrigated in an attempt to control the infection. Dr. Sanderson testified that this condition continued throughout the month of November, at which time he became ill himself; but he testified that from her condition the last time he saw her "it would seem impossible for her to make a recovery without permanent or serious disabilities and disfigurement of her face, which, it is probable, will be quite marked." This physician further testified: "I think that her injuries will seriously interfere with her profession as a nurse because of the disfigurement and the embarrassment caused by same to her, besides a possible disability being due to the fractured clavicle which went for a long time without effort to reduce."

Dr. Caldwell, who saw the plaintiff first on December 29th, said:

"She was acutely ill, with fever of 102 degrees, and pulse rapid and weak, her jaw and face were very much swollen and pus was escaping into the mouth and through several openings beneath the chin; and any movement of the jaw was extremely painful and difficult, the teeth could not be brought together and were extremely sensitive to pressure or movement. The X-ray examination showed a fracture of the mid-portion of the lower jaw with loose fragments which was held in place loosely by a wire, and the two main fragments were overlapped and displaced. There was also a fracture of the clavicle in the middle with complete separation of the fragments and marked overlapping.

"Miss Stone was under my care in the Schumpert Sanitarium from approximately December 8th to January 1st, during which time I saw her once or twice daily, with the exception of two or three days about Christmas time when I was absent from the City. * * * The patient was last seen January 11, 1930, at which time there was no union of the fracture of the clavicle and the wires were still holding the fragments of the jaw together. By suitable operation of the bone reduction and plating of the clavicle it is probable that union and good position can be obtained; unless union is obtained there will be appreciable weakness and pain associated with the use of the right shoulder amounting to a considerable disability, but one which could not be estimated without careful re-examination. With regard to the jaw, in the hands of a skilled specialist in jaw and plastic surgery it might be possible to refracture the jaw and restore the fragments to fairly good position and insert bone graft and obtain union without gross deformity of the bony structure of the jaw; the plastic operation for removal of the scar will improve the appearance after the bone operation has been

effected but will not restore the face to its normal appearance. When these measures have been taken it will still be necessary to arrange an appliance carrying false teeth, which will have to be used constantly. Such procedure will consume approximately a year's time and require several operations, the outcome of which at best would be problematical. Such operations are very delicate and require a great deal of skill. * * *

"She will suffer pain in connection with the operations that would be required for restoration at intervals and during the year's time that she would necessarily be under treatment. When the treatment is completed, if it is successful, she would probably not have further pain. * * *

"In her present condition, Miss Stone could not carry on her occupation as a nurse at all for the reason that she would not have sufficient strength in the right arm and her nutrition will probably be impaired on account of the condition of her jaw. Furthermore, a nurse with facial disfigurement has great difficulty in obtaining employment. The cumulative effect of shock and pain which she has endured, together with the anxiety concerning the possible outcome and her sensitiveness concerning the disability and disfigurement combine to render her nervous condition very unstable and incapacitates her for active work of any kind. * * *

"It will not be possible to restore her appearance absolutely, neither will it be possible to absolutely and completely restore her health, but the degree of disability could not be estimated with any accuracy at this time."

There was other testimony of like tendency, and the plaintiff herself testified to her numerous injuries; to severe and long-continued pain; inability to raise her arm without hurting her shoulder, and that she "cannot do anything like I used to and I get so weak."

Other testimony might perhaps be appropriately quoted, but there can be no doubt of the fact that plaintiff was most seriously injured, suffered great pain, and in the language of appellee's counsel is "pitifully disfigured," rendering it quite probable that she will never be able to successfully pursue any gainful employment. Generally speaking, the amount of compensation to be awarded in such cases is for the jury. See Citizens' Ry. Co. v. Griffin, 49 Tex. Civ. App. 569, 109 S. W. 999, writ of error refused, and authorities therein cited. We have found no such error in the proceedings as indicates that the jury in assessing the amount was influenced by prejudice or passion, and the verdict having been approved by the trial court, it will not be disturbed.

For the reasons stated, all assignments and propositions of error are overruled, and the judgment affirmed.

### On Motion for Rehearing.

The motion for rehearing in this case is purely formal, consisting as it does of complaints that this court erred in overruling the 81 assignments of error and propositions in support thereof as presented in appellant's original brief. Upon the submission of the motion, however, appellant filed a vigorous written argument especially complaining of our action: First, in refusing to set aside the order of the trial court which overruled appellant's motion for a new trial on the ground of misconduct of the jury in the matter of examining the timber and tail-light of the truck which had been offered in evidence by the defendant; second, in reversing the trial court's ruling that the ex parte deposition of appellee should not be taken as confessed; and, third, in failing to discuss and in overruling appellant's propositions 23, 23a, 34, and 34a.

■ We think appellee in her reply brief sufficiently disposes of these special contentions, but in view of the earnestness with which appellant has urged the special complaints above indicated, we will add, in addition to what we have said in our original opinion, that the question of whether the tail-light on appellant's truck was in a condition rendering it impossible for it to have been lighted at the time of the accident was not specifically presented as an issue in the pleadings. Appellant's answer, so far as it related to this question, was merely a general denial of the alleged fact that it was not burning at the time of the collision. The evidence tending to show, as more particularly developed by the jury, that the condition of the light was such that it could not have been burning at the time of the accident, was not the ultimate fact necessary to support plaintiff's case. It was merely evidentiary and corroborative of the evidence introduced in behalf of appellee on the trial that the light was not burning. The tail-light and wood to which it was attached was voluntarily offered in evidence on behalf of appellant and voluntarily submitted to the jury during the argument and no exception made to its having been passed to the jury. It may be true, as insisted, that the object of its introduction was to show the force of the impact of the car in which appellee was riding and thus corroborate appellant's contention that the driver of the car and appellee were guilty of negligence in driving at a terrific rate of speed; but there is nothing to show that the jury did not give due consideration of this contention, and we remain of the opinion that appellant is in no position to complain that the jury also observed other conditions of the exhibit corroborative of other evidence which of itself sufficiently supports the vital issue of whether the tail-light was burning at the time of the collision.

■ We deem it unnecessary to add to what we said in our original opinion relating to the ex parte deposition of appellee, particularly in view of appellee's answer to the contention in this respect; but we perhaps should here briefly call attention to the complaint that we should have considered and sustained appellant's propositions 23, 23a, 34 and 34a. Propositions 34 and 34a complain of the refusal of the trial court to sustain an exception to the court's following special issue No. 2, which reads thus: "Do you find from a preponderance of the evidence that the defendant's truck which was hit by the Dodge coupe was being operated at the time same was struck without a tail light burning?" The exception to this charge was that it was "upon the weight of the evidence, misleading and particularly in this: because it does not inquire whether the defendant or his agent, Kearns, used ordinary prudence to see that the tail light was burning and does not inquire whether the tail light had just recently been burning and whether a person of ordinary prudence would have discovered that the same was not burning at the moment of the accident, and whether or not the driver Kearns knew that the same was not burning at the moment of the accident or in the exercise of ordinary care would have discovered that same was not then burning if, in fact, it was not."

Propositions 23 and 23a were to the effect that the court erred in refusing to give appellant's requested issue No. 9, which reads thus: "If in answer to special issue No. 2 you say 'yes', then do you find from a preponderance of the evidence that Mr. Thomas W. Kearns, the driver of the Ford truck in question, knew that the tail lamp was not burning at the time it was struck by the Dodge car."

It is insisted that it thus conclusively appears that the trial court committed reversible error, the following cases being cited in support of this contention: Taber v. Smith, 26 S.W.(2d) 722, by the Amarillo Court of Civil Appeals, and Berkovitz v. American River Gravel Co., 191 Cal. 195, 215 P. 675, by the Supreme Court of California, citing Sheerin & Redfield, Negligence, para. 467.

The trial court gave approved definitions of "negligence," "proximate cause," "new and independent cause," "unavoidable accident," and "contributory negligence," and in addition to special issue No. 2, special issue No. 3 reads:

"If you have answered special issue No. 2 'yes,' then answer:

"Do you find from a preponderance of the evidence that the collision mentioned in special issue No. 2 occurred after dark?"

To this the jury answered, "Yes."

Special issue No. 4 reads:

"If you have answered special issues Nos. 2 and 3 both 'yes', then answer this issue:

"Do you find from a preponderance of the evidence that such conduct on the part of the employee of the said W. P. Lincoln, defendant, in so driving and operating said truck at said time constituted negligence as that term negligence has been heretofore defined?"

The answer to this was, "Yes."

The jury then further found that this negligence was the proximate cause of the injury.

While the driver of the truck in question testified to the effect that he had examined the lights on his car shortly before the accident and that the tail-light was then burning, the answer of the defendant to plaintiff's contention consisted of a denial of plaintiff's allegation that the tail-light was not burning. There was no specific allegation to the effect that if mistaken in this respect it yet was true that the driver of the truck was justifiably ignorant of the fact, having exercised ordinary care under the circumstances to see that it was burning. The issue of whether the light was burning was distinct from the issue of whether its failure to burn was unknown to the driver, and also distinct from the further issue of whether the failure of the light to burn at the time of the accident was due to a want of ordinary care on the part of the driver. It was not necessary, if indeed proper, to embody in special issue No. 2 as given by the court the element of due care on the part of the driver, and if the driver failed to use due care to keep the tail-light burning, the fact that at the particular time he was without knowledge of its failure to burn as sought by appellant's requested issue No. 9 was immaterial. There was no special request on the part of appellant that the issue of care on the part of the driver be submitted, and as it seems to us the court's charge in a general way embodied this element. By reference to the court's special issue No. 4 the jury was required to find in event of their affirmative answers to special issues 2 and 3 whether the driver was guilty of negligence in operating the truck at the time. Nowhere does the charge assume that the mere failure to have the light burning at the time was negligence per se. It was not so alleged by the plaintiff, nor was it so submitted by the court, and in this respect the case is distinguishable from Taber v. Smith and Berkovitz v. American River Gravel Company, cited above in behalf of appellant.

We will not further amplify the record, already voluminous, but conclude by saying that on the whole we have been unable to agree that the trial court committed reversible error in the particulars urged.

The motion for rehearing is accordingly overruled.