**PARKS et ux. v. MISSOURI, K. & T. R. CO. OF TEXAS. (No. 12060.)**

Court of Civil Appeals of Texas. Fort Worth. May 25, 1929.

Rehearing Denied June 22, 1929.

J. R. Black, of Fort Worth, and J. H. Beall, of Sweetwater, for appellants.

Thompson & Barwise and Fred L. Wallace, all of Fort Worth, for appellee.

CONNER, C. J. The appellee railroad company extended its line of railway through the city of Fort Worth and into and through Hyde Park addition in the southeast part of the city, where it established its switch yards. W. C. Parks and wife, Carrie Parks, owned lots 77 and 78 and the east 12 feet of lot 79 in block 4 of the addition situated some 150 or 200 feet east of the east line of the switch yards, and this suit was instituted by them to recover alleged damages in the decreased value of the property mentioned because of a lateral extension of appellee's switch yards, thus bringing the operating tracks of appellee some 100 feet or more nearer the dwelling house in which appellants lived as their home. Lots 78 and 79 are situated west of lot 77, upon which appellants' homestead is situated, and were purchased by appellants after the location of the switch yards as originally constituted.

Appellants alleged that, by reason of the extension of the yards in an easterly direction towards their property, the noises in switching, ringing of bells, etc., made their home less desirable as a residence, and had greatly depreciated the value of their property. This suit was accordingly instituted by them to recover damages in the amount of $3,000 for the depreciated market value of the property caused by the operation of the switch yards.

While the petition contains numerous allegations of personal inconvenience and discomfort to the appellants, no recovery for damages to the person seems to have been sought on this ground; the allegations of inconvenience, etc., referred to being alleged as mere incidents showing the depreciation of the property.

The defendant railway company answered by a general denial, and to the effect that the property had been enhanced in value rather than otherwise.

The case was submitted to a jury upon special issues, only one of which in the state of the record we deem necessary to notice, to wit: "Was the market value of plaintiff's property lessened or depreciated by reason of the defendant moving and constructing its tracks and right of way, as it has moved and constructed the same, and by reason of the difference, if any, in the operation of its trains over said tracks after such change?"

To this issue the jury answered "No," and judgment was accordingly rendered that plaintiffs take nothing by their suit, and this appeal has been duly prosecuted by appellants from the judgment so rendered.

Pretermitting a discussion of appellee's objections to appellants' propositions, we will observe that the first six assignments of error in somewhat different forms are to the effect that the finding of the jury in answer to the quoted issue is wholly without evidence, or competent evidence, to support it, or at least is against the great preponderance and weight of the evidence. While appellants offered testimony in support of their allegations of depreciation, the appellee introduced as a witness C. G. Borho. He testified in part as follows:

"I am in the real estate business. * * * I have been in the real estate business about fifteen years and ten years of that time in Fort Worth. * * * I have had occasion to become acquainted with the market value of property in the southeast portion of the city, in the vicinity of Hyde Park Addition, where the Katy yards are. I have had occasion to have transactions in real estate in that locality as a real estate man; we have procured the listing of quite a good deal of property in that section. I am familiar with the value of property in that part of the city. I know the property belonging to W. C. Parks

at 620 Arlington Avenue and I have seen the property. I have a fair knowledge of the work done by the Katy out in that neighborhood—not the extent of it, but that they did extend their yards out there. I have a fair idea as to the reasonable market value of Mr. Parks' property immediately prior to the time that extension work began out there; my judgment would be that it was worth somewhere from three thousand to thirty five hundred dollars at that time.

"I would think that I was familiar with the reasonable market value of that property immediately after that extension work was completed, and I can't see a great deal of difference in the value of the property before and after that work was done. I think the property was worth somewhere around thirty five hundred dollars after that yard was improved and extended."

On cross-examination he testified, in part: "I have never been in Mr. Parks' house, but I am sure I have been on that street and have seen his property. I guess it has been some three or four months since I last saw that property. I would say there was not much difference between his house and the other houses in that vicinity. I think it is about the same size as the balance of the houses around there; generally speaking, the houses around there are cottages. I believe that Mr. Parks' house is a little bit larger than the houses adjoining it. I do not know how many rooms he has in his house. I can form a fair estimate as to the market value of a house without going inside of it; you can usually judge a house from the outside. I woud say that there are six or seven rooms in Mr. Parks' house. I would not change my valuation of the property, if it should develop that there are ten rooms in the house; I would have to go through the house and examine it before I would change my estimate any. From the outside the house showed to be in good condition. I don't know anything about the inside of it. I can only give a general idea about the value of the property from the inspection I have made of it from the outside and from the surroundings.

"Q. Assuming that the noise from the movement of the trains out there is twice as bad as it was before the new yards were built there, and assuming that the annoyance from the dust and smoke is twice as much as it was prior to the time they put in the new yards and that the house shakes at night on account of the pumping and knocking of those locomotives out there such as to wake people up at night from their sleep on account of the shaking of the house which condition did not exist prior to the time the new yards were put in there, and assuming that they put in seven or eight new railroad tracks there nearer to Mr. Parks' house and assuming that they moved the main line from right immediately east of the round house over to the furtherest track east, as they now

exist, would you still state that the market value of the property has not been depreciated? A. Well, I figure, as I stated before, that the value of that property is practically as great now as it was in 1925, which would probably answer your question. I will say that the property would probably sell now for as much as it would have sold for in 1925. Will that answer you? I am trying to answer your question to the best of my ability and judgment.

"I don't think I have, personally, sold anything right there in the vicinity of Mr. Parks' property since the yards were enlarged out there. I know generally about that property out there because I have been handling it for quite a while."

█ We think the six assignments mentioned must be overruled under the decisions by which we must be guided. In the case of Onstatt v. Crain (Tex. Civ. App.) 282 S. W. 666, special issues were submitted to the jury, upon which conflicting evidence was offered, and the court in disposing of this case said: "The verdict of the jury finding either for the plaintiff or the defendant on conflicting testimony will not be disturbed on appeal, where there is evidence to support such verdict of the jury, unless it is so clearly against the preponderance of the testimony as to shock the conscience."

In the case of Mercedes Produce Co. v. Roddy (Tex. Civ. App.) 249 S. W. 249, 251, Judge Smith in rendering the opinion states as follows: "Appellant in its fourth proposition of law asserts that under the evidence the verdict of the jury was excessive, in support of which it is contended that appellee's own testimony is contradictory with reference to the cost of marketing and delivering his crops. We think, however, that, even though appellee's testimony was inconsistent in some particulars, the issues raised thereby were of fact for the jury, whose findings thereon we are without authority to disturb." See, also, Columbia Casualty Co. v. Ray (Tex. Civ. App.) 5 S.W.(2d) 230; El Paso Electric Co. v. Whitenack (Tex. Com. App.) 1 S.W.(2d) 594.

██ Giving to Borho's testimony the most favorable construction that a jury could have reasonably given it, we conclude that it is sufficient, as stated, to support the finding of the jury in answer to question No. 1. It was the jury's function to determine the credibility and the weight to be given to the testimony of appellants' witnesses of a conflicting tendency, as well as to that of Borho, and also for the jury to determine the effect to be given to any apparent inconsistency, if any, in the testimony of Borho. Appellants' first six assignments of error are accordingly overruled.

Appellants' remaining assignments, 7, 8, and 9, urge misconduct on the part of the jury. The alleged misconduct is based upon the testimony of F. T. Foshee, C. W. Vance, and Sneed Lary, all of whom served

as jurors on the case. The testimony of these jurors was considered by the court on the hearing of appellants' motion for a new trial and is presented herein Q. and A. form, covering approximately 13 pages of the transcript. It will not all be copied, but all has been considered, and we will endeavor to state so much thereof as will give the force of appellants' contentions. All of the jurors named testified to the fact of sitting as jurors and of their concurrence in the verdict rendered. Mr. Foshee testified that he was acquainted with Mr. Fillingim, one of the jurors, and that he heard him say something about living close to the Missouri, Kansas & Texas Railroad, and that the noise did not disturb him very much.

"Q. What did he say about the effect on the value of his property? A. I don't know —I didn't hear him say anything about that.

"Q. What was said, if anything, about the jury not being allowed to go out and look at the plaintiff's property? A. Some of the jurors mentioned it that if we could have gone out to see the property that it would be better on it; I don't know who that was said that.

"Q. Was there anything said or not said as to whether or not the plaintiff was afraid to have the jury look at it—afraid he did not have a good case? A. No, I don't remember anything like that.

"Q. What do you know about the discussion or whether anything was said about the plaintiff having bought the lots between his house and the railroad in order to stick the railroad? A. No, I don't believe so.

"Q. You don't remember that? A. No, sir.

"Q. Those things that you have testified about just now, did you consider those matters in connection with the other testimony that you heard in the case? A. No.

"Q. You didn't pay any attention, then, to what Fillingim said or what was said about the jury not being allowed to go out and inspect the property? A. No.

"Q. You just decided solely on the evidence that you heard on the witness stand—is that your testimony? A. Yes."

The juror Vance testified, among other things, that:

"There was one fellow said he owned property in about the same distance that Mr. Parks did from the railroad and he said the trains rattled his windows and created right smart of noise, but he didn't figure that they damaged his property any, but I don't know whether that was before or after.

"Q. I understand. Now what discussion did you hear, if any, about the jury not being allowed to go out and inspect the property? A. Well, they said it looked like they ought to have been allowed to have went out and inspected it.

"Q. Was there anything said by anybody about it looking like the plaintiff was afraid to have a jury look at his property? A. Yes, that it looked kinder like he was afraid to let them go out.

"Q. What was said, if anything, about the plaintiff, Parks, buying some vacant lots between his house and the railroad in order to stick the railroad? A. Well, we were all— I was at least, under the impression that he had bought his lots down towards the railroad from his house, when they came out there buying up property with the intention of selling it to the railroad at a profit; that is the way it looked to me; I don't know whether the rest of them looked at it that way or not.

"Q. That was the impression of all of them as far as you know? A. Yes.

"Q. That was discussed to some extent, was it not? A. Yes. I think so.

"Q. Now all of those things, and also the testimony that was given from the witness stand is what caused you to arrive at your verdict, is it not? A. Yes, sir."

On cross-examination he testified that the jury was out "only a few minutes" and stayed in the jury room a little while afterwards, and that was the reason why he could not remember whether the conversation of which he had spoken took place before or after they had voted; that he understood the court had instructed them not to consider anything else but the testimony in the case, and that his verdict was based on what he thought about the case; that the remarks to which he had referred might have occurred after the jury "got through"; and that he agreed to the answers given to the special issues before they were brought in because he thought "it was what ought to be returned from the testimony" heard in court, and that he still thought so; and that all the jurors were of the same opinion, and that it "just took one vote to put it over."

Sneed Lary testified in part to the effect that when they first went into the jury room a foreman was elected and the case discussed "a little bit * * * relative to the damage as caused by this railroad project"; that one of the jurors remarked that he lived near the railroad, but that he did not remember that he said anything about whether "it hurt his property or not"; that he did not hear anything said about the jurors not being permitted to go out and view the property; that he heard somebody say that the fair way to settle a dispute like that would be that "a fellow could come about his conclusion better had he been able to see the exact conditions of the land—the exact lay of the land with respect to the railroad"; that he heard nothing of any objection on the part of plaintiff to the jurors going out to see the property, nor did he hear anything about plaintiffs having bought a couple of lots between their house and the railroad; that the jury only took one vote and "were unanimous on the first vote."

"The Court: How long was the jury out?

A. Well, it wasn't long; we got in there and were seated and some one of the fellows says, he says, 'I expect the first thing to do is to elect a foreman,' and so a foreman was elected and so we were seated around the table and the foreman suggested—he says, 'Well, you have read the charges,' and he says 'the first thing to do is to take a vote as to the damage done,' and we all voted and .it happened that we all voted one way.

"Q. The discussion that you heard—the remark that you heard made by this man in regard to living close to the railroad, was that remark made before or after you had voted? A. Now, really, I don't know; I don't know whether it was made before or afterwards; I remember that remark being made.

"Q. You don't remember when it was made? A. No, sir, it wasn't made during the voting.

"Q. Were you in anyway influenced by the remark that he made? A. No, sir.

"Q. Did you answer those questions that were submitted and agreed to those answers because you thought from the testimony that is what the answers ought to have been or not? A. That is the way I believe that I was answering."

At the conclusion of the hearing, the court overruled the motion for rehearing; hence the assignment of error under consideration.

Article 2234, Rev. St. 1925, reads: "Where the ground of the motion is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury or that they received other testimony, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the testimony received, or the communication made, be material."

It is to be noted that the statute in order to constitute misconduct on the part of a juror requires that the testimony received, or communication made, must be "material," and it has been expressly so decided by our Commission of Appeals in the case of International-Great N. Ry. Co. v. Cooper (Tex. Com. App.) 1 S.W.(2d) 578, 580, in which opinion Judge Critz says: "It will be seen that article 2234 expressly provides that a new trial may be granted, 'if such misconduct proved, or the testimony received, or the communication made, be material.' It is our opinion that the phrase 'be material' applies to, and qualifies, the whole of article 2234."

It was said by Judge Leddy, of the Commission of Appeals, in the late case of St. Louis, B. & M. Ry. Co. v. Cole, 14 S.W.(2d) 1024, quoting from the headnotes, that: "The trial court, in considering evidence offered on hearing of motion for new trial, has same latitude in passing on credibility of witnesses and weight to be given their testimony as jury has on original trial"—citing the cases of Houston & T. C. Ry. Co. v. Gray, 105 Tex.

42, 143 S. W. 606; Bradley v. T. & P. Ry. Co. (Tex. Com. App.) 1 S.W.(2d) 861; Chicago, R. I. & G. Ry. Co. v. Swann, 60 Tex. Civ. App. 427, 127 S. W. 1164.

In the case of Bradley v. T. & P. Ry. Co., supra, it was said, quoting from the headnotes: "On appeal from denial of motion for new trial, on the ground that there was misconduct of a juror, the appellate court must take the most favorable view of evidence produced as the trial court was authorized to take."

The statute authorizing the granting of a new trial 'on the ground of misconduct on the part of a jury is an innovation on the common-law rule and should be construed strictly and not extended so as to discuss the solemn verdict of a jury and the decree of the court for casual and immaterial discussions among the jurors. We see nothing in the testimony of the jurors relied upon by appellants in this case that probably influenced the verdict against appellant or that would justify us in holding that the trial judge abused his discretion in overruling the motion for a new trial based on the ground of "misconduct." .

We conclude that all assignments of error should be overruled and the judgment affirmed.