IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JULY 1999 SESSION



**FILED**

**September 10, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9805-CR-00209 |
| | ) | |
| | ) | Davidson County |
| v. | ) | |
| | ) | Honorable Frank G. Clement, Jr., Judge |
| | ) | |
| SHAWN ROBERT COTTON | ) | (Vehicular homicide by intoxication) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Robert P. Ballinger
601 Woodland Street
Nashville, TN 37206
(AT TRIAL AND ON APPEAL)


John G. Oliva
601 Woodland Street
Nashville, TN 37206
(ON APPEAL)

For the Appellee:

Paul G. Summers
Attorney General of Tennessee
    and
Daryl J. Brand
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General
    and
Bernie McEvoy
Assistant District Attorney General
Washington Square, Suite 500
222 2nd Avenue North
Nashville, TN 37201-1649

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Shawn Robert Cotton, appeals as of right his conviction by a jury in the Davidson County Criminal Court for vehicular homicide by intoxication, a Class B felony. The trial court sentenced the defendant to serve twelve years in the Department of Correction as a Range I, standard offender. The defendant contends that:

> (1) the evidence is insufficient to support the conviction,
>
> (2) the trial court erred during voir dire by impliedly threatening to hold the jurors in contempt for perjury if they failed to return a verdict,
>
> (3) the state improperly struck African-American female jurors from the panel based upon their race and gender,
>
> (4) the state improperly commented upon the defendant's silence and improperly appealed to the jury's sympathy during argument, and
>
> (5) the cumulative effect of the errors violates the defendant's right to a fair trial.

We affirm the trial court's judgment of conviction.

Detective Rickey Ollis testified that on April 2, 1996, at 3:15 a.m., he was responding to another dispatch when he heard tires screech and a crash. He said that in less than thirty seconds, he came upon a red Camaro embedded in an embankment across from a "T" intersection. He stated that on the driver's side, he saw an unconscious male seated behind the steering wheel. He said the man had long, dark hair and was of average build. He identified this man as the defendant. He said he saw a female slumped down in the passenger seat with her chin on her chest. He said her feet were bent underneath the passenger's bucket seat, and her back was against the bottom of the seat as if she were sliding out of it. He stated that the driver's door was jammed, and he tapped on the driver's window two or three times until the defendant started to move. He said the passenger's door was also jammed, but he could see the passenger's chest rising and falling. He stated that he radioed for an

2

ambulance and an extrication unit. He said that he then saw a third person rise up in the back seat.

Detective Ollis testified that the fire department arrived within five minutes and that he directed them to the passenger's side, believing the female had the most serious injuries. He said that once they cut and pried the passenger's door open, the defendant immediately crawled out over the female. He said that a large gear shift separated the car's bucket seats. He said that considering the distance between the seats and the dashboard, it would not have been possible for two adults to change places in the car during the accident.

Metro Police Officer Donald Davidson testified that he went to the accident scene. He said that the front of the 1968 red Camaro was compacted but that the damage did not extend through to the passenger's compartment. He said the occupants were still inside the car when he arrived, and he saw a male with shoulder-length hair in the driver's seat. He said that the man, whom he identified as the defendant, was looking around. He said he saw an unconscious female in the passenger's seat with her body mostly down on the floorboard. He said this woman was eventually identified as the victim, Helen Hollis.

Officer Davidson testified that he asked the defendant what happened and that the defendant told him that he thought the police were chasing them. He said the defendant appeared dazed. He said he went to the passenger's side a few seconds before the door was pried open. He said the defendant crawled over the victim and out the passenger's door. He said the backseat passenger, who was later identified as Chad Jumps, crawled between the seats, over the victim and out the passenger's door.

3

Officer Davidson testified that he led the defendant away from the car, observed that the defendant's eyes were red, and noticed the odor of alcohol on the defendant's breath. He said that he asked the defendant what happened, and the defendant first responded that the victim was driving. He said the defendant admitted that he had been drinking, stated that the victim was driving, and said that a car pulled out in front of them. Officer Davidson said that when he told the defendant that he saw the defendant in the driver's seat, the defendant said that the defendant had made a mistake, that he meant to say that he was driving, and that he was trying to help the victim because she had been drinking that night. Officer Davidson said that he explained the implied consent law to the defendant and requested that the defendant submit to a blood alcohol test. He said the defendant replied, "I'll give you any f***ing thing you want because I wasn't driving."

Officer Davidson testified that about three hours after the wreck, he arrested the defendant and advised him of his Miranda rights. He said that the defendant nodded his head to indicate that he did understand his rights. He said he then asked if the defendant could tell him what happened, and the defendant shook his head to indicate "no." Officer Davidson said that he again asked the defendant if he could tell them who was driving or what happened, and the defendant again shook his head to indicate "no."

Officer Davidson testified that the inside of the car was damaged from the occupants striking the dashboard and that the glove box was heavily dented in the area of the victim's knees. He admitted that the dents in the glove box did not reveal the identity of the passenger. He stated that the cracks that extended across the car's windshield resulted from the front of the car compacting upon impact and were not consistent with a person's head striking the windshield. He said that the steering wheel was bent from impact with an occupant. He stated that based upon the physical

4

evidence, the car hit the embankment straight on and that nothing indicated that the car had spun or rolled.

Sandra Fielder, an emergency room nurse, testified that she treated the defendant on April 2, 1996. She said that the defendant had two lacerations on his chin and abrasions on his left hand and right elbow. She said that she did not see any injuries to his chest. She stated that he smelled strongly of alcohol. She said that he initially refused to submit to a blood alcohol test, claiming that he did not like needles. She said that she laughed because the defendant's chest was covered with blue tattoos, and she told him she thought that he could stand the test if he had been able to stand the tattoos. She said that the defendant later agreed to the test. She said that her notes from that day indicate that the defendant denied being the driver of the car.

Officer David Kitchens testified that he worked in the accident investigation division of the Metro Police Department. He said that he was called to an accident scene after 3:15 a.m. on April 2, 1996. He said that he saw a female in the passenger's seat with her feet tucked underneath her. He said that the defendant had just left the car and that the odor of alcohol from the defendant's mouth was obvious to extreme. He said that he saw no evidence that the car had flipped or spun. He said the damage to the steering wheel stood out in his mind.

Officer Kitchens testified that he followed the defendant to the hospital where the defendant was loud, boisterous, profane and refused to stay on the bed. He said he read the implied consent law to the defendant again and asked him to submit to a blood alcohol test. He said that the defendant refused the test. He said he informed the defendant that the officers would force him to submit to the test, and the defendant agreed to the test after speaking with another officer. He said that while at the hospital

5

with the defendant, he saw a red, half-moon shaped mark across the defendant's chest.

Metro Police Officer Jim Reed testified that he was at the hospital with the defendant when the defendant refused to submit to a blood alcohol test because he was afraid of needles. He said that he told the defendant that his fear of needles was illogical given the fact that the defendant was covered with tattoos. He said that he noticed an obvious reddish, semi-circular mark on the defendant's chest similar to a mark that would be left upon colliding with a steering wheel.

Special Agent John Harrison of the Tennessee Bureau of Investigation (TBI) testified that he worked as a toxicologist at the state crime laboratory. He said that the defendant's blood sample revealed a blood alcohol content of .17 percent.

Dr. Bruce Levy, the Davidson County Medical Examiner, testified as an expert in forensic pathology. He said that he had reviewed the autopsy report on the victim. He said that the report revealed that she suffered a broken jaw; chin lacerations; a broken neck; a crushed larynx and trachea; multiple broken ribs; tears in her liver; a broken spine; a broken right arm; two broken ankles; bruising to her knees, the front of her legs, and the right side of her chest; and bleeding on the back of her scalp. He said that she died as a result of the blunt force injuries that she received in the accident. He said that the injuries were consistent with her sitting in the passenger's seat of a car involved in a front end collision. He said that while it would be possible for her to have received the injuries while in the driver's seat, her most serious injuries were to her head and neck; whereas, had she been behind the steering wheel, the most serious injuries would have been to the chest area. He noted that she did not have a steering wheel imprint.

6

Joe Farmer testified that on April 2, 1996, he was working for Browning-Ferris Industries relocating dumpsters from 1 a.m. to 1 p.m. He said that he likes cars and that between 2:40 and 2:50 a.m., he noticed a red Camaro across from him at an intersection. He said that an attractive, dark-haired young woman was driving, and she had two male passengers. Although he admitted that his truck sits very high up from the ground, he said that he was positive about the gender of the driver. He said that later that morning, another driver told him about an accident involving a red Camaro, in which a young woman was killed.

Chad Jumps testified that he is an acquaintance of the defendant. He said that in early April 1996, he was in Tennessee helping the defendant move back to Illinois. He said that he and the defendant went to a bar and spoke with the bartender, who offered to show them another night spot called the Mix Factory when her shift ended. He said that he thought the bartender's name was Christina Hollis. He said that she drove them to the Mix Factory, and they stayed until it closed around 3:00 a.m. He stated that when they left the Mix Factory, Ms. Hollis drove, the defendant sat in the passenger's seat, and he sat in the backseat behind the defendant. He said they stopped at a gas station and bought a twelve pack of beer. He said that Ms. Hollis was driving when they left the gas station and that he does not remember anything from then until he awoke in the hospital about eight hours later.

Dr. Charles Harlan testified that he previously served as the chief medical examiner for the state of Tennessee, and in addition to his private practice, he currently served on a contract basis as the county medical examiner for seven counties in middle Tennessee. He stated that he reviewed the victim's medical records, including the autopsy report and photographs of the damage to the car, and he concluded that the victim was driving the car at the time of the accident. He stated that the victim's broken ankles were consistent with the victim bracing her feet against the brake pedal, the

7

accelerator pedal, or the floorboard of the car. He said that her liver injuries could have been caused by impact with the bottom of the steering wheel. He said that her broken ribs were consistent with her chest hitting the sides of the steering wheel. He stated that her broken arm could have resulted from gripping or bracing against the steering wheel or dashboard at the time of impact. He said that he believed her neck injuries were caused by the impact with the dashboard over the steering wheel. He admitted that the injuries to the victim's neck could have been caused by striking the dashboard on either side of the car, but he said that the victim's injuries were caused by multiple points of impact. He stated that if the victim were in the passenger's seat when the accident occurred, sufficient points of impact would not have been present to explain all of her injuries.

Dr. Harlan testified that he had also reviewed the defendant's emergency room records and Metro Fire Department EMS records from the time of the accident. He stated that the EMS records note that the defendant had negative trauma to his chest. He said that the emergency room records reveal that the doctor noted no bruising on the defendant's chest in an office visit two days after the accident. He concluded that if the defendant had exhibited a red semi-circle on his chest on April 2, this injury would have also been apparent two days later. He noted that the defendant had pooling of blood and abrasions in the knee area. He stated that the defendant's injuries were not consistent with him being the driver.

Based upon the foregoing evidence, the jury found the defendant guilty of vehicular homicide by intoxication and vehicular homicide by reckless endangerment. The trial court merged the two convictions into the vehicular homicide by intoxication count because the charges stemmed from a single death.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to prove beyond a reasonable doubt that he was driving the car at the time of the accident. He argues that because Dr. Harlan concluded that the victim was the driver based upon her injuries and because Joe Farmer saw the victim driving the car shortly before the accident, the state has failed to disprove all reasonable alternatives to the circumstantial evidence placing him in the driver's seat. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). For circumstantial evidence to provide the sole basis for the conviction, the facts must be "so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." State v. Crawford, 225 Tenn. 478, 484, 470 S.W.2d 610, 613 (1971). The evidence must be both consistent with the defendant's guilt and inconsistent with the defendant's innocence, exclude all other reasonable theories except that of guilt, and establish the defendant's guilt so as to convince the mind beyond a reasonable doubt that he or she committed the crime. Patterson v. State, 4 Tenn. Crim. App. 657, 661, 475 S.W.2d 201, 203 (1971). Whether other reasonable inferences are excluded by the circumstantial evidence is also a question for the jury.

9

Tenn. Code Ann. § 39-13-213(a)(2) defines vehicular homicide as "the reckless killing of another by the operation of an automobile, . . . [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401." Viewing the evidence in the light most favorable to the state, Dr. Levy testified that the victim died as a result of the injuries she sustained in the accident. Special Agent Harrison testified that the defendant's blood alcohol content was .17 percent on the morning of the accident. Based upon this percentage, the defendant is presumed to be under the influence of an intoxicant and his ability to drive thereby impaired. See Tenn. Code Ann. § 55-10-408(b).

The circumstantial evidence points to the defendant as the driver of the Camaro at the time of the accident. Officer Ollis testified that he found the defendant unconscious in the driver's seat thirty seconds after he heard the crash. Officers Ollis, Davidson and Kitchens all testified that the victim was on the passenger's side with her feet bent beneath her seat. Officers Kitchens and Reed reported seeing a red semi-circular mark on the defendant's chest shortly after the accident. Testimony and photographs introduced at the trial revealed that the Camaro had bucket seats separated by a tall gear shift. Both Officers Davidson and Kitchens found no evidence that the car had spun or rolled. Dr. Levy and Dr. Harlan both admitted that the victim's injuries could have been sustained in either the driver's seat or the passenger's seat, with each providing a different explanation of how the victim's injuries indicated a particular position. The jury obviously accredited the explanation provided by Dr. Levy. Although Mr. Farmer testified that he saw a woman driving the Camaro between 2:40 and 2:50 p.m., he did not know who was driving the car at the time of the accident about twenty-five minutes later. Furthermore, Mr. Farmer or any other witness failed to give any reasonable explanation of how the defendant came to be located in the driver's seat thirty seconds after the accident occurred. Thus, the evidence taken in the

10

light most favorable to the state excludes all reasonable theories except that of the defendant as the driver.

## II.  TRIAL COURT'S STATEMENT TO THE JURY VENIRE

The defendant contends that the trial court committed reversible error when it told the jurors during voir dire that they would be held in contempt for perjury if they failed to return a verdict consistent with the trial court's instruction on the law.  The defendant admits that he failed to object contemporaneously to the trial court's statement.  However, he asks that we find plain error because the trial court's statement prejudiced the judicial process, thereby requiring a new trial even if the misconduct did not influence the verdict.  See State v. Perry, 740 S.W.2d 723, 726 (Tenn. Crim. App. 1987) (holding that prejudice to the judicial process resulting from a juror's exposure to extraneous information required a new trial even though the error probably had no effect on the trial's outcome); Tenn. R. Crim. P. 52(b).

The statement in question came during the trial court's explanation of the purpose of voir dire to the jury pool.  The trial court told the potential jurors that they need not disregard their individual life experiences and their common sense when deliberating.  The trial court then stated as follows:

> It is important however, that your life experiences and your beliefs not interfere with your responsibilities.
>
> The most important thing that I may say today is that for you to be a juror, you must be able to be fair, impartial, and unbiased; fair, impartial, and unbiased.  And the reason I say that is, think of it this way:  If you knew of someone who had a matter that needed to go to court and needed to be ruled upon by jurors, wouldn't it be terribly unfair if one or more members of the jury had their minds made up before they ever heard the evidence, before they ever heard a witness testify, and before they ever heard what the law was?  That wouldn't be fair.  And you don't want to be in that position and I sure don't.
>
> And I promise you, if you serve on the jury, and this case may take two or three days to try.  If you serve on the jury, this jury, and if during those deliberations, two or three

11

> days later you say, I'm sorry, I just can't apply the law that Judge Clement read to us, I've just got real strong feelings about this and I don't care what the law is, this is the way I see it and I'm going to rule this way. Well, you will have wasted everybody's time. You will have offended at least [eleven] people in the jury room. And I may hold you in contempt for having committed perjury. So don't put yourself or the others in that position.
>
> Be honest with yourself, be honest with me, be honest with your fellow jurors when we ask you if you have life experiences or if you have opinions on the subject. Just share it with us. It's best to get it out early.
>
> And what can I do, I'll visit with you and say, well, can you put that aside and make a decision based solely upon what the witness testified to and what the law is? And if you can answer that in good faith, then you'll be a great juror.
>
> And if you say, I'm sorry, but my belief on this issue, or my life experience was so personal and so heartfelt that I just can't put that aside. And then what I'll say is, thank you very much for your honesty, you've done what you should do. I would excuse you not from the whole jury panel but just from this case, because it may be this type of case might not be the best case for you.

The defendant challenges the underlined portion.

"The ultimate goal of voir dire is to insure that jurors are competent, unbiased and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the discretion of the trial court." State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994). Rule 24(f), Tenn. R. Crim. P., directs that the trial court "give the prospective jurors appropriate admonitions regarding their conduct during the selection process." The trial court's statement, when viewed in the context of the court's explanation of the potential jurors' responsibilities, was merely an admonition to the potential jurors to respond truthfully during voir dire. Given this context, we do not believe it to be clear error that adversely affected a substantial right of the defendant as is required for a determination of plain error. See State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

## III. BATSON CHALLENGE

12

The defendant contends that the state used its peremptory challenges to strike African-American females from the jury on the basis of their race and gender in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986). He argues that the state's alleged reason for striking these potential jurors was pretextual. The state contends that the trial court properly determined that the state challenged these potential jurors based upon a valid, race-neutral reason.

The state questioned the jury panel about their views on circumstantial evidence using several hypothetical scenarios. Ms. Cage said that she would not want to find the defendant guilty if the evidence against him were circumstantial. Ms. Lee did not believe the circumstantial evidence in the prosecutor's hypothetical was good strong evidence and even stated that the prosecutor had provided no evidence in his hypothetical. Ms. Taylor stated that she wanted more proof beyond the circumstantial evidence presented in the hypothetical. In response to a hypothetical burglary with a questionable eyewitness naming one perpetrator and circumstantial evidence pointing to a second perpetrator, Ms. Akins said that she was not sure which individual was the perpetrator. The prosecutor asked for a show of hands from the jury panel of those who thought the circumstantial evidence in his hypothetical was good strong evidence. Subsequent questioning reveals that Ms. Lee and Ms. Cage did not raise their hands, but the record does not reveal whether Ms. Taylor or Ms. Akins raised their hands.

The trial court denied the state's motion to strike Ms. Cage for cause, noting that although it was a close issue, she had not received the jury charge defining direct and circumstantial evidence. The state then used its peremptory challenges to strike Ms. Cage, Ms. Lee, Ms. Taylor, and Ms. Akins. The defendant objected, and the trial court held a hearing in chambers. The state noted that although it had struck four African-American women, three of the four replacements were African-American women. The state said that it struck the women because they did not like

13

circumstantial evidence. The trial court found that the record fully supported the state's reason, noting that the responses of the stricken jurors indicated that they "did not much care for circumstantial evidence, to say the very least."

In Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), the United States Supreme Court held that a state's use of peremptory challenges to exclude intentionally jurors of the defendant's race violates the defendant's Fourteenth Amendment right to equal protection. The Court upheld this principle in Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364 (1991), but eliminated the requirement that the defendant and the potential juror share the same race. The Court held that race was "irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges." Id. at 416, 111 S. Ct. at 1373. The Court subsequently held that peremptory strikes based solely on gender are also constitutionally impermissible. J.E.B. v. Alabama ex. rel T.B., 511 U.S. 127, 140, 114 S. Ct. 1419, 1427-28 (1994); see State v. Turner, 879 S.W.2d 819, 821-23 (Tenn. 1994).

A defendant seeking to raise a Batson claim has the initial burden of making a prima facie showing of purposeful discrimination against a prospective juror. Batson 476 U.S. at 93-94, 106 S. Ct. at 1721; State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992). Our supreme court has held that in order to establish a prima facie case, a defendant "must establish that a consideration of all the relevant circumstances raises an inference of purposeful discrimination." Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 902-03 (Tenn. 1996). Once the defendant establishes a prima facie showing of purposeful discrimination, the burden shifts to the state to articulate a race-neutral reason for the challenge. Batson, 476 U.S. at 97, 106 S. Ct. at 1723. The state's explanation "must be based on more than stereotypical assumptions, but it need not rise to the level required to justify the exercise of a challenge for cause." Ellison, 841 S.W.2d at 826; Batson, 476 U.S. at 97, 106 S. Ct. at 1723.

14

In ruling on an objection to the discriminatory use of a peremptory challenge, the trial court must articulate specific reasons for each of its factual findings. Woodson, 916 S.W.2d at 906. First, the court should explain why the objecting party has or has not established a prima facie showing of purposeful discrimination. Then, if the defendant has made a prima facie showing, the court must determine whether the state gave a race-neutral explanation for the challenge and whether it finds, based on the totality of the circumstances, that the challenge was the result of purposeful discrimination. Id. "The trial court's factual findings are imperative in this context. On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." Id.

In this case, the trial court did not explicitly state whether the defendant made a prima facie showing of discrimination. In Woodson, our supreme court concluded that the trial court had found that the objecting party made a prima facie showing of purposeful discrimination, reasoning that if the objecting party had not made a prima facie showing, the trial court would not have required an explanation for the challenge. Id. at 905. In any event, the trial court in the present case concluded that the state's reason for challenging the prospective jurors was not discriminatory. The defendant claims that the trial court only found that the state's challenges were not discriminatory with regard to race but made no finding concerning gender. We note that the trial court stated that peremptory challenges could not be used to discriminate on the basis of race or gender. Although the court did point out that the state did not strike the African-Americans who replaced the potential jurors in question, we believe the record reveals that the trial court's finding of no discrimination applies to both race and gender. The court accredited the prosecutor's response that he challenged the jurors based upon their lack of confidence in circumstantial evidence.

The defendant contends that the state's reason was pretextual because many jurors who were not stricken expressed similar reservations about circumstantial evidence. The defendant downplays the four women's distrust of circumstantial evidence. Ms. Lee and Ms. Cage could not accept that circumstantial evidence could be good evidence. Ms. Taylor stated that she would need proof beyond circumstantial evidence. Ms. Akins declined to choose circumstantial evidence over questionable direct evidence. Although some potential jurors indicated that they would have to carefully weigh the circumstantial evidence, the remaining members of the venire indicated that circumstantial evidence could be good evidence. The one remaining potential juror who stated that direct evidence was better than circumstantial evidence also said that he could believe circumstantial evidence. Based upon a careful examination of the record before us, we cannot say that the trial court's finding is clearly erroneous.

## IV.  IMPROPER ARGUMENT

The defendant contends that the state improperly commented upon the defendant's silence during its opening statement, its case-in-chief and its closing argument. The defendant also argues that the state improperly appealed to the jury's sympathy during closing argument. The state contends that the defendant mischaracterizes the prosecutor's analysis of the evidence as commenting upon the defendant's silence. The state also asserts that even if the prosecutor's reference to the victim's family could be considered a victim impact argument, it is harmless error at most.

The state initially contends that the defendant has waived these issues by failing to object contemporaneously or to raise the issues in his motion for a new trial. The defendant argues that because his right against self-incrimination under the Fifth Amendment is a fundamental right, the failure to make a contemporaneous objection

16

does not bar this court's consideration of the issue of whether the state improperly commented upon the defendant's silence. With regard to the prosecutor's alleged appeal to the jury's sympathy, the defendant contends that the trial court has a duty to insure <u>sua</u> <u>sponte</u> that closing arguments are appropriate, and the improper argument constitutes plain error. Failure to object contemporaneously to improper argument constitutes a waiver pursuant to Rule 36(a), T.R.A.P. Furthermore, errors related to the misconduct of counsel must be presented in the motion for a new trial to be preserved for our review. T.R.A.P. 3(e). This court has previously held that the issue of whether the state improperly commented upon a defendant's failure to testify was waived when it was not included in the motion for a new trial. <u>State v. Hix</u>, 696 S.W.2d 22, 26 (Tenn. Crim. App. 1984). Thus, we will review these issues to determine if plain error exists. <u>See</u> Tenn. R. Crim. P. 52(b).

## A. COMMENTS UPON THE DEFENDANT'S SILENCE

The defendant cites four points in the record in which he characterizes the prosecutor's remarks or the testimony solicited as a comment upon the defendant's refusal to answer questions from the investigating officer after the <u>Miranda</u> warnings were given. When a defendant elects not to testify at trial, a prosecutor may not comment upon the defendant's failure to make a statement to the police because this would punish the defendant for exercising his or her constitutional right to remain silent. <u>Braden v. State</u>, 534 S.W.2d 657, 659-60 (Tenn. 1976). The United States Supreme Court has held that it is "impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [a defendant] stood mute or claimed his privilege in the face of accusation." <u>Miranda v. Arizona</u>, 384 U.S. 436, 468, 86 S. Ct. 1602, 1625 (1966). A prosecutor may comment upon the defendant's veracity when the comment is supported by evidence in the record. <u>State v. West</u>, 767 S.W.2d 387, 394 (Tenn. 1989); <u>State v. Beasley</u>, 536 S.W.2d 328, 330 (Tenn. 1976).

17

The defendant asserts that the prosecutor commented upon the defendant's silence when the prosecutor related in the opening statement that the defendant admitted driving but did not know how the accident occurred:

> During the course of the evening, police officers spoke to the defendant a number of times. And each time, he told them a very, very different story. The first time officers spoke to the defendant at the scene, the defendant said, police were chasing us, we were running from the police and crashed. That wasn't true.
>
> He spoke with the police a second time, he said a car pulled out in front of us, and he pulled out of a gas station, it ran us off the road. That wasn't true.
>
> He spoke to the police a third time, he said yes, [I] have been drinking, but it doesn't matter, I wasn't driving. She was driving. Helen Hollis was driving. That wasn't true.
>
> Finally, the defendant told the truth. He said to the officers, he was driving. He said, he didn't remember how the crash occurred. That's what happened.

The defendant claims the underlined section is a comment on his silence. We do not view the statement that the defendant admitted driving to relate to the defendant's failure to give a statement to the police. Instead, the prosecutor simply pointed out to the jury which of defendant's statements to the police should be believed. This portion of the statement was proper.

The reference to the defendant not remembering how the crash occurred relates to the responses that the defendant gave Officer Davidson after the officer advised the defendant of his Miranda rights. The defendant also challenges this portion of Officer Davidson's testimony, which was as follows:

> PROSECUTOR: [About three hours after the wreck,] you once again questioned the defendant about the collision?
>
> DAVIDSON: Yes sir. At that time, I advised him of his constitutional rights and I asked him if he could tell me what happened--well, I asked him, did he understand his rights? He shook his head, yes, that he did.
>
> I asked him, could he tell me what happened in the collision? He shook his head, no. I said, can you tell me who

18

was driving or what happened? And he again, shook his head, no.

The defendant characterizes the negative head shake as a refusal to make a statement. The state contends that the defendant's responses were not a refusal to answer but rather were voluntary answers to the officer's questions made after the defendant had been informed of his constitutional rights and had indicated that he understood those rights. When a defendant voluntarily makes a statement after being informed of his or her constitutional rights, the state may comment upon the scope of that statement. See Ware v. State, 565 S.W.2d 906, 908 (Tenn. Crim. App. 1978). It is unclear whether the defendant's responses to Officer Davidson's questions constituted answers to those questions or a refusal to answer. In any event, even if the responses were a refusal to make a statement, thereby making Officer Davidson's testimony and the prosecutor's reference to that testimony comments upon the defendant's silence, we believe this error to be harmless beyond a reasonable doubt in light of the remaining evidence supporting the defendant's guilt.

The defendant also contends that the following statement made by the state during its closing argument constitutes a comment upon the defendant's silence:

Has the defense given you any reasonable explanation [about] how the defendant ended up in the driver's seat and Helen Hollis ended up in the passenger's seat seconds after a viable, (sic) high impact front-end collision? They haven't.

This court has held that comments indicating that the state's proof remains uncontradicted do not implicate the defendant's choice not to testify. Thompson v. State, 958 S.W.2d 156, 168 (Tenn. Crim. App. 1997) (reviewing the failure to object to the state's argument that the defendant had offered no defense to the crime); State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991) (analyzing the state's comment that "there's no other reasonable explanation, none given"); State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985) (analyzing the state's argument that the defendant had offered no "excuse or justification" for his escape); State v. Coury, 697

S.W.2d 373, 378 (Tenn. Crim. App. 1985). The state's argument that the defendant failed to explain his and the victim's positions immediately after the accident is of this nature. It was proper argument.

Finally, the defendant asserts that the state commented upon his silence during its rebuttal argument by referring to his lack of remorse:

> The medical personnel finally get there. They have to use the jaws of life to pry the car open. What is the first thing Shawn Cotton does? Is he wondering how this person here [that] is just barely hanging on to her life [is] doing? Does he see if she needs help? No. He climbs from the driver's seat over her body to the passenger's seat to get out. No remorse whatsoever for a person laying next to him dying.
>
> . . . .
>
> Let's talk about the defendant on April 2, 1996. We do know that from the get-go there was one statement, he denied driving. We do know that he asked numerous times about his car. He was very upset that his car was totaled out. Did we hear any statements that he made concerning the welfare of the passengers in the car? Nothing. All we heard [were] his concerns about his car trying to shift the burden . . . away from himself.

The state contends that these were comments about the defendant's demeanor and conduct shortly after the accident, and they are relevant to the defendant's intoxication, an element of the crime. A prosecutor may properly base his or her argument upon inferences supported by evidence in the record. See State v. Brown, 836 S.W.2d 530, 552 (Tenn. 1992). We view these remarks to be an evaluation of the defendant's demeanor based upon evidence in the record.

### B. SYMPATHY

The defendant contends that the state appealed to the jury's sympathy by referring to the presence of the victim's family during its closing argument. Our supreme court has recognized that closing argument is a valuable privilege for both the state and the defense and that counsel is afforded wide latitude in presenting final argument to the jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998); State v.

20

Cone, 665 S.W.2d 87, 94 (Tenn. 1984). When a prosecutor's argument goes beyond the latitude afforded, the test for determining if reversal is required is whether the impropriety "affected the verdict to the prejudice of the defendant." Harrington v. State, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965). Factors relevant to that determination include:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

The prosecutor concluded his closing argument as follows:

> We don't know much about Helen Hollis. We don't know what sort of daughter she was to her parents. We don't know what sort of friend she was to the people she worked with. We don't know what sort of mother she was to her son. But we do know this, there were people who loved her, they're here in the courtroom today, her mother and her step-father. And they've been present for every moment, they've heard every word that was uttered. And for them, this is the most important criminal case in the world. And I know you will give it the consideration it deserves.

While we view the reference to the importance of the case to the victim's parents to be inappropriate, we conclude that it did not affect the verdict to the defendant's prejudice. The context of the statement indicates that it was made to impress upon the jury the importance of their deliberations. Considering the trial court's instruction to the jury that the attorneys' arguments were not evidence and the strength of the evidence against the defendant, we hold that the statement did not affect the verdict to the defendant's prejudice.

21

## V. CUMULATIVE EFFECT OF ERROR

The defendant argues that the cumulative effect of the foregoing errors deprived him of a fair trial. We believe that the trial court's errors are of such an inconsequential nature that no cumulative error exists.

In consideration of the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
James Curwood Witt, Jr., Judge

_____
John Everett Williams, Judge

22